**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**ROGER GOODEN, II,**

                **Petitioner,**

    **v.**                                    **Civil Action No. 2:13cv37**
                                                **Criminal Action No. 2:11cr33-05**
                                                **(Judge Bailey)**

**UNITED STATES OF AMERICA,**

                **Respondent.**

## REPORT AND RECOMMENDATION

This case came before the Court for an evidentiary hearing on May 22, 2014. The Petitioner, a federal inmate, appeared by telephone from the facility where he was incarcerated. Appearing in person were Brendan S. Leary, Esq., on behalf of petitioner, and John C. Parr, Esq. Assistant United States Attorney ("AUSA"), on behalf of the United States. Also present were Dorwin Wolfe, Esq., ["Attorney Wolfe" or "Wolfe"] petitioner's former defense counsel; petitioner's witness, his mother, Lena Oldacker; and respondent's witness, Dawn Bucher, legal assistant to Dorwin Wolfe.

## I.  Procedural History

Petitioner initiated this case by filing a Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence on May 23, 2013. (Dkt.# 331). In the petition, Petitioner asserted three grounds for relief. After being ordered to answer the petition, the government responded, including filing a motion to dismiss. On March 26, 2014, the undersigned issued a Report and Recommendation ("R&R") recommending that grounds one and two be dismissed. However, an evidentiary hearing was scheduled as to ground three, petitioner's claim that despite his request to counsel, that counsel file an appeal on his behalf, counsel failed to do so.

On April 21, 2014, the Honorable John P. Bailey, Chief United States District Judge, adopted the undersigned's initial R&R, and in doing so, denied and dismissed grounds one and two. (Dkt.# 398).

## II. Evidentiary Hearing

The following is a recap of the testimony provided to the Court on May 22, 2014.

### 1. Lena Oldacker[1]

On direct examination Mrs. Oldacker testified that she was petitioner's mother; had attended petitioner's sentencing hearing; and was present in the courtroom when the U.S. Marshals took him into custody. She testified she thought that her son was free on bond prior to sentencing, but also testified that "they" were told that petitioner was being taken back to the Tygart Valley Regional Jail ("TVRJ") just long enough to collect his belongings, and that he would then be sent immediately to a federal facility. She testified that she could not recall how long her son remained at the TVRJ, because the events happened a year ago.

Mrs. Oldacker testified that she kept in touch with her son at each place he was incarcerated, and that they both wrote and spoke by phone. She testified that on one occasion, during a phone call, her son asked her to contact his attorney because he couldn't get through to him. She testified that she asked him what she was supposed to say, and that her son told her to tell his attorney to get in touch with him as soon as possible, that it was "very important." She testified that "[t]hat pretty much was the consistency of the conversation we had about that." She asserted that her son did not tell her why she needed to contact his attorney.

When asked if her son had ever written her a letter, asking her to contact his attorney, she testified that "[h]e might have." Again, she testified that it had been a year, and she could not

---

[1] Lena Oldacker's testimony can be found at Dkt.# 406 at 9 – 18.

recall all the events. She testified that after her son asked her to contact Wolfe, she looked Wolfe up in the phone book; called his office "between seven and ten times;" and that "a few times I got a busy signal. Sometimes I just didn't get an answer, I'm assuming it was after hours. A couple of times I got a . . . voice recording. One time I actually talked to somebody." She believes the person she spoke to was a woman, but was unsure. She testified that on that occasion, she asked to speak to Mr. Wolfe and was told he was unavailable, so she left a message to be given to him, telling him who her son was, and advising that her son was trying to reach Mr. Wolfe but was having trouble contacting him. She testified that she did not tell the person who answered why her son needed to speak to Mr. Wolfe, because she did not know the reason why. She denied having ever left a voice mail on any the calls when she received a voice recording, testifying that she did not, because she made the calls on her cell phone as she walked to and from work, and assumed that the noise of traffic would interfere with the quality of any voice mail she might leave. She testified that once she finally got through and spoke to someone to leave the message, she "figured, you know, that's it, I've done my part. And I didn't give it a whole lot of thought because I assumed, you know, they can get ahold of my son." She testified that after that, she did not call again, and never wrote to Attorney Wolfe's office. She further testified that she spoke with her son afterwards to let him know she had gotten through, but that afterwards, they never discussed it again. She testified that she had "no idea" that her son had wanted to file an appeal until "you [Attorney Leary] called me, actually."

On cross examination by AUSA Parr, she testified that her son's request to her to contact his attorney was made "less than a month" after sentencing. She could not recall where he was incarcerated when he made the request; and she testified that she never visited him while he was at the TVRJ.

## 2.  **Petitioner, Roger Gooden, II**[2]

On direct exam by Attorney Leary, petitioner testified that he had been in federal custody for two years, and that he "vaguely" recalled certain parts of his criminal prosecution.

Petitioner testified that he was indicted in December, 2011 and Attorney Wolfe was court-appointed to represent him at his initial appearance in January, 2012, when he was released on personal recognizance bond with certain conditions. He testified that he had never been in federal court before.  He first met Attorney Wolfe on the day of his initial appearance and they met again later to go over a discovery motion and the evidence, before deciding to enter into plea negotiations.

He testified that when the plea agreement was provided, it was "large," four or five pages, and maybe 10 - 15 paragraphs, and he sat down with Attorney Wolfe to go over it in detail; however, he averred that Wolfe did not read every paragraph of the plea agreement to him, but instead, "skimmed around" and did not read it word for word, only "pointed out some important parts of it maybe." He admitted that he had read the plea agreement himself.  When asked if he recalled the provision in the agreement that said he was waiving his right to appeal, he testified that "[a]fter the Court sent me a summarization, it was pointed out to my attention that I had; but I did not remember that, no."  However, he admitted having been asked questions about the waiver of his appellate rights by Magistrate Judge Kaull at his plea hearing.

Petitioner testified that he did receive Defendant's Exhibit No. 1, a February 9, 2012 letter from Attorney Wolfe, asking him to contact Wolfe's office to schedule an appointment to meet and discuss the plea agreement, and that subsequently, he met with Attorney Wolfe at his office to do that.  He first testified that he could not recall if the plea agreement was attached to

---

[2] Petitioner's testimony can be found in Dkt.# 406 at 19 – 43.

the letter, but then testified that "I don't believe that he sent it through the mail. I believe he had it in his office."[3]

Petitioner testified that he met with Attorney Wolfe his office again after the plea hearing, to discuss the presentence report ("PSR") and methamphetamine dangerousness sentencing enhancement. When asked if they discussed an appeal during that meeting he testified "I believe we did." When asked to elaborate, he testified that "[t]here were certain things that did or did not happen that we may have to file an appeal at a later date" and that "there was still time to file an appeal." He testified that he advised Wolfe that he wanted to object to the three-level enhancement, because he did not think it should apply, and "that if . . . [the enhancement] stuck, that maybe we would have to appeal the whole process." He testified that Attorney Wolfe was "pretty negative about it" and "just kind of brushed it aside like, you know, trials or any kind of appeal would not be doable." When asked if Attorney Wolfe advised him that he had waived his right to appeal, he testified "I believe he may have mentioned that."

Petitioner testified that he and Wolfe met again on the morning of the sentencing hearing, and again "briefly mentioned" to Wolfe the possibility of "an overall appeal had things [sic] not went a certain direction at the sentencing hearing[.]" He testified that although Wolfe "never really touched down on it" he assumed Wolfe "had it under control" and would object to the sentencing enhancement. He testified that at the sentencing hearing, the enhancement was imposed without objection by Attorney Wolfe, resulting in a 70-month sentence.

Petitioner testified that after the sentencing hearing concluded, he was immediately taken in to custody, but before he was "[v]ery, very briskly" rushed out of the courtroom by the

---

[3] Defendant's Exh. No. 1, a February 9, 2012, cover letter from Attorney Wolfe's legal assistant, reads in pertinent part: "Dr. Mr. Gooden, [p]lease find enclosed a copy of a plea agreement for your review. Please make sure you read this document over very carefully. Please contact this office to set up a date and time that you will be available to come in to discuss this with Mr. Wolfe . . . Sincerely, Dawn Bucher, Legal Assistant. Enclosures[.]" Dkt.# 401- 1 at 1.

Marshals, was able to briefly speak to Wolfe, and told him that he wanted to appeal. Petitioner testified that he "was trying to speak over the loudness as people were getting up out of their seats," but that Attorney Wolfe "just began gathering his papers and didn't even give me a second glance."

Petitioner testified that after the hearing, he was taken to a holding tank at the rear of the courthouse to wait for other inmates' proceedings to finish, and then they were all transported to the TVRJ together. He testified that Wolfe did not come back to talk to him while he was there.

Petitioner testified that he believed he remained at the TVRJ for seven to ten days; that during that time, he tried twice to reach Wolfe by phone about filing an appeal: one time there was no answer and the phone "just rang off the hook" without going to voice mail, "because it doesn't allow that feature on collect calls," and the second time, someone did pick up, but refused to accept the charges for his collect call. He testified that during that time, he also wrote Wolfe two letters reiterating his desire to file an appeal within 14 days of the sentencing hearing, but received no response to them.

He testified that when he could not reach Wolfe himself, he contacted his mother, explained that it was very important that he talk to Wolfe immediately, and "had her try to contact Mr. Wolfe with no success." He was "pretty sure" he told his mother why he needed to talk to Wolfe: that he needed Wolfe to "get ahold of me immediately because I needed to file this thing in a timely manner." He was "fairly sure" he also wrote a letter to his mother, asking her to do the same. When asked if his mother wrote to Attorney Wolfe on his behalf, he said that although he wasn't sure, but he believed that she did.

Petitioner was shown Defendant's Exhibit No. 2, a May 23, 2012 letter from Attorney Wolfe, sent to his home address, advising him in pertinent part that he had 10 days to file an

appeal; that if he wanted to appeal, he should contact Attorney Wolfe's office as soon as possible; or, if he could not afford an attorney, he should contact the court for a court-appointed attorney. Petitioner testified that he never received that letter, that he had only ever received "1 and 3 of these exhibits."[4]

Next, after being shown Defendant's Exh. No. 3, a May 28, 2012 cover letter from Attorney Wolfe, enclosing a copy of the Judgment in a Criminal Case and Statement of Reasons, advising petitioner to read them carefully because it was very important that he abide by all of their terms and conditions, petitioner testified that he did not receive the letter until sometime in July, 2012, when he arrived at FCI McDowell, and that the letter was "backdated for, I believe it was sometime in May." He testified that he never received any mail from Attorney Wolfe while he was at TVRJ, nor did he ever have any phone conversations with Wolfe during that time.

Petitioner testified that after he left TVRJ, he was sent to the Northeast Ohio Correctional Center in Youngstown, Ohio; he was not sure how long he remained there; and he did not write any letters to Attorney Wolfe during this time. He could not recall if he ever attempted to call Attorney Wolfe after he left TVRJ, and testified that "at this point I was pretty sure that the time line had expired." Petitioner testified that at some point, he learned that an appeal had not been filed on his behalf, but he could not recall how he learned that.

On cross examination by AUSA Parr, petitioner admitted that he did not keep copies of the two letters he wrote to Attorney Wolfe about filing an appeal while he was at the TVRJ. He testified that he was at the TVRJ when he asked his mother to contact Attorney Wolfe's office. AUSA Parr verified with petitioner that he had testified earlier that his mother was unsuccessful in reaching Attorney Wolfe's office, and petitioner said "[y]es. That's what she told me[.]"

---

[4] Dkt.# 406 at 33.

When asked if he recalled being sworn and under oath at his plea and sentencing hearings, he testified "I don't remember it, but I'm sure that it was a part of the proceedings[.]" When asked if, at the sentencing hearing, if he recalled hearing Attorney Wolfe say that there were no objections to the PSR, and then making a plea on his behalf for a sentence below the guideline level, he testified that '[w]hat I mainly remember about that is that he went on to some spiel about mental health and not really touching down on the things that we had discussed." When pressed by AUSA Parr as to his recollection that the Court asked Wolfe at sentencing if there were any objections to the PSR, and Wolfe said there were none and did not raise any, petitioner admitted "kind of" remembering "something like that," but said that he was not familiar with proper procedure in federal court, and "what you can and cannot do" there.

When asked if he recalled being asked, while under oath at the plea hearing, about the waiver of his appellate rights, he testified "[t]here's a lot of things that go on during those things, I don't particularly remember that, no. But if I recall, it's a part of the record so it did transpire."

After being reminded that in his §2255 petition, and in its later declaration, he made no mention of any letters written to Attorney Wolfe about filing an appeal, only that "immediately upon sentencing, I asked for an appeal," he was asked to verify that his testimony now is that he actually wrote letters, petitioner said that he did; when questioned as to why he left that information out of his sworn declaration, petitioner testified "I was told that it's best to keep those things brief."    When questioned regarding his "second memorandum,"[5] where he still made no mention of his mother's intervention on his behalf, or the letters he wrote to Attorney Wolfe, and petitioner testified that he was not sure how to answer that question without referring to a copy of his memorandum.

---

[5] The docket indicates that petitioner only filed one memorandum to his §2255 petition, but it was not filed until July 12, 2013, a little over seven weeks after he filed the §2255 petition.

On redirect examination, Attorney Leary questioned petitioner as to why, when Attorney Wolfe made no objections to the PSR at the sentencing hearing, he did not tell the judge himself that he wanted to object, petitioner testified that he thought it was his attorney's job to do that, and further, he did not know what the procedure was or what to say.

Attorney Leary also read a portion of petitioner's §2255 memorandum[6] aloud, stating: "I tried to contact Mr. Wolfe previously by letter and by telephone. But I have been unsuccessful in my attempts to do so either because Mr. Wolfe is simply rejecting to talk to me, or there is a miscommunication." Attorney Leary and petitioner both agreed that petitioner did in fact include mention in his declaration that he tried to write to Attorney Wolfe about the appeal.

### 3. **The Magistrate Judge**

Magistrate Judge Seibert questioned petitioner as to his agreement to waive his attorney-client privilege with Attorney Wolfe, to permit Attorney Wolfe to testify as to their confidential communications. Petitioner stated his willingness to permit Wolfe to so testify.

### 4. **Dorwin Wolfe, Esq.**[7]

On direct examination, Attorney Wolfe testified that he is an attorney practicing in the Elkins, West Virginia area; he was admitted to the bar in 1991; first worked in a firm for two years but has been a solo practitioner since then; and has practiced in federal criminal court in the Northern District since 1991, when he was appointed to the CJA panel. He testified that "in the old days" "before the public defender went in," there were "more cases but they were bigger cases." Since the public defender office was created, his federal criminal load "got lightened," and he is currently actively litigating six federal criminal cases, in various stages, which has been about his average for the past 3-5 years. He also represents criminal clients on appeal, either

---

[6] Dkt.# 357 at 8.

[7] Attorney Dorwin Wolfe's testimony can be found in Dkt.# 406 at 44 – 73.

through the CJA panel as a panel attorney, or by CJA appellate work "out of Richmond [Virginia]." He testified that he has one secretary in his office.

Attorney Wolfe testified that he has routine procedures in place in his office for when he represents criminal clients, to ensure compliance with the Federal Rules of Criminal Procedure and the 14-day time period in which to notice an appeal after a judgment is entered. He testified that he advises his clients of their appellate rights prior to the entry of any plea; the client is also advised of the same at the plea hearing; he advises them again prior to the sentencing hearing; the client is advised again at the sentencing hearing, and then afterwards, they are advised again.

Wolfe testified that he represented Roger Gooden and that Gooden's case resolved with a plea agreement containing a waiver of appellate rights. Wolfe testified that he had discussions with Gooden several times about appellate rights, but that Gooden "did not indicate that he wished to appeal at any point." When asked if he documented Gooden's decision for the record, Wolfe testified that "[u]sually a letter will go out after the hearing to the client. It might be in the notes which I provided to Mr. Parr. I believe it's mentioned in the - - surrounding the entry of plea, there is an entry in my notes about that. Other than that, it's just conversation with my client." When asked if he ever sent Gooden any letters regarding the appeal notices, Wolfe testified that he did.

AUSA Parr presented Wolfe with Defendant's Exh. No. 2, the May 23, 2012 letter to Gooden, sent to him at his home address, and dated the day of Gooden's sentencing, and asked him how the letter went out, and if he followed up on the letter in any way, because of the address to which the letter was sent. Wolfe testified that the sentencing hearing that day started at 10:55 am in Elkins; he was at the courthouse by approximately 9:30 am; Gooden arrived at

approximately 10:00 am; from 10:00 – 10:55 am, they went over the plea agreement and PSR.

Wolfe testified that

> I have all the rules that are cited in the plea or . .. [PSR], we review all that.  We review the statutes, we go over all of that.  I have a copy for my client and a copy for myself.  That's our procedure . . . We went through the hearing.  He was advised by the Court 14 days to appeal.  The hearing concluded at 11:15, I believe. I talked to him briefly after the hearing. I actually remember him exiting and looking back after we chatted. He did not get to self-report. Most clients at that time were self-reporting but he was not. I was kind of upset with that. And I could see that he wasn't as upset as me, but he was surprised.

Dkt.# 406 at 49.

Wolfe testified that after he returned to his office, his secretary had already prepared a letter advising Gooden of his appellate rights. [Because] [w]e had had some difficulty with him staying in touch with us . . . [s]he put ten days in the letter so that he would not wait. I signed the letter . . . glanced at it and signed it.  And then went on to whatever else I was doing . . . that letter was created at 11:27 . . . [and] was then mailed to him on that date."  Wolfe further testified that afterwards, he reviewed his file, and realized that the letter went to Gooden at the Tallmansville address, where Gooden no longer was, so he addressed the issue with his secretary, who told him that she did not realize that Gooden did not get to self-report.  Wolfe testified that he told her that "we still need to wait for the judgment to be entered.  The judgment was not entered . . . until May 29th.  She prepared a letter to the jail."  Wolfe testified that he has a "paperless office;" when a Judgment is entered and docketed in the computer, it "comes through" to both him and his secretary; once he knew the Judgment was entered, he asked his secretary to make sure that Gooden knew about his appellate rights and got a copy of the judgment and commitment order.  He testified that his secretary prepared another letter, and that, because "sometimes they can move clients," he instructed her to call to verify Gooden's location before sending it. She called the TVRJ and told Wolfe "I just checked, he's [still] there." Wolfe

testified that his secretary prepared the cover letter for the Judgment Order and Statement of Reasons, and another copy of the May 23, 2012 letter that was previously sent to Gooden's home address, all of which was mailed to Gooden at the TVRJ that day.[8]

Wolfe testified that he never heard anything from Gooden after that "until some matters got filed in his federal case[.]" AUSA Parr reiterated with Wolfe his testimony was that the May 23, 2012 letter advising Gooden of his time to file an appeal was re-sent to him at the TVRJ, and Wolfe testified:

> [a]bsolutely. I wanted to make sure that he had his judgment and conviction order [and] . . . that he knew he - - there was time running from May 29th on. And in fact, I watched the case, kept tabs on it. We never had any phone calls or anything the next 14 days after that. So I concluded at that point he didn't wish anything to be done on appeal.

Dkt.# 406 at 51.

AUSA Parr questioned Wolfe about the three-level enhancement for methamphetamine dangerousness in the PSR and asked if Gooden had ever, at any point, even prior to sentencing, indicated that he wanted to appeal that issue if he lost. Wolfe testified:

> [n]o, he did not. We had a phone conference where there was [sic] notes taken where that was addressed prior to the plea. We created a folder called a dangerousness folder, where he put facts and things in there of cases [sic]. We were aware of that [issue] early on. I met with probation over that. I met with Steve Warner prior. Monday I met with Mr. Gooden for an hour; Tuesday, I met with Mr. Warner for approximately an hour. And the plea agreement was prepared later, on February 2nd, 2012 . . . [s]o prior to even negotiating the plea, we discussed the dangerousness.

Dkt.# 406 at 51 - 52. AUSA Parr reframed Wolfe's testimony: "[s]o . . . your testimony is he was aware he was going to get the three levels and there was never an issue . . . of an appeal?" Wolfe testified that yes, because the methamphetamine dangerousness was an issue right from the beginning, because the fact of the case were that someone was brewing methamphetamine in

---

[8] Dkt.# 406 at 72-73.

Gooden's "stepfather's home . . . " and a batch of "shake and bake" methamphetamine started "spewing" and "[s]omeone got burnt . . . or something else happened in the kitchen, a fire. Numerous things."  He testified that "I went and even talked to Rocky Hebb . . . a Buckhannon police officer . . . interviewed him and Buddy Brady . . . it's just – it's one of those things that if . . . it's in a home or the environment, the enhancement does apply."   He further testified that even after Gooden saw that in the PSR, Gooden never said that if the enhancement was going to stick he wanted to appeal the issue.  Wolfe explained that

> things that I put in sentencing memorandums [sic] and the . . . [PSR's are] all done in advance . . . we're always talking about what's happening next month.  So there will be letters to him at the end of April about things that we need for the sentencing memorandum.  We plan what date it's going to be mailed.  A copy is given to him in advance. If at any point in time he wished to challenge the dangerousness, he could have done that or we could have done that.  Sometimes we go and informally take care of things . . . So we tried on the dangerousness, I talked to my client . . .to Steve . . . to probation.  There was no way that we could win it informally.  And we did not challenge it formally because we did not have any sufficient grounds that we would have succeeded.

Dkt.# 406 at 53.

AUSA Parr again reiterated with Wolfe his testimony that Gooden had never, either before or after sentencing, asked him to appeal that issue or any other issue, and Wolfe testified "[h]e never asked me to appeal any issue at any time."

Attorney Wolfe testified that he was unaware of anyone from Gooden's family ever calling his office after the sentencing, to indicate that Gooden wanted to appeal.  Wolfe testified that the practice in his office for him to receive phone messages from callers is that using Microsoft Outlook Express for email, and a calendar/billing/conflict system called Abacus, that has "entry systems where, what you do on a case in terms of a phone message or a document that's emailed, is linked. I reviewed that system."  He testified that there was no indication that after sentencing, there had ever been any calls from Gooden or anyone on his behalf.  He

testified that if a phone message came in when he was not in the office, his secretary would type it up and email it to him; he would then get it on both his cell phone and laptop; that way, even if he traveling, he could just "push it and call back the client."  However, he testified, there were "no phone calls linked to this folder in there. And there was no phone calls in the paper file. No phone calls under the electronic file under his name either."  He testified that he had provided a copy of the file to Attorney Leary, but that one system was "internal, so you can't really - - it's part of the network and it's - - . . . built into the server.  So you can't provide . . . it's electronic.  I reviewed - -"

Wolfe testified that his secretary during the relevant time period was Dawn Bucher.

On cross examination, Attorney Wolfe testified that the first time he met petitioner was when he was arraigned, prior to being appointed to represent him.

Wolfe testified that he attached a copy of the plea agreement to the February 9, 2012 cover letter to petitioner about the plea agreement.[9]  He testified that petitioner did make an appointment, and they met to discuss the agreement at 4:00 pm on February 14, 2012, the day the agreement was signed.  He testified that he did recall going over the plea agreement with petitioner paragraph by paragraph, but he cannot recall if he read every single word.  He testified that "[u]sually I will go through it and read . . . it to them," that "that would have been something that I would have done" but "at this point" he could no longer specifically recall  doing it. However, he testified that he did specifically recall discussing the paragraph about the appellate waiver with petitioner, and testified that petitioner never asked him whether, if the enhancement for methamphetamine dangerousness ended up being applied, that an appeal would be filed.

---

[9] Defendant's Exh. No. 1, Dkt.# 401-1.

Wolfe testified that they did not stipulate to the methamphetamine dangerousness enhancement in the plea agreement: "we could not stipulate to that, nor would I stipulate to that."

He testified that he did not file an objection to the enhancement because Gooden did not want him to, and there was no good faith basis for doing so. However, he testified that depending on the facts and circumstances, if his client had asked him to file one, he would have tried to make a factual argument, even if he thought he would lose. However, he testified that

> [i]f it gets to the point where a client directs me to do something that's against the rules of ethics, I have conversations that I have with my client regarding that. I did not see any of that in this situation. We simply talked about the evidence. We weighed the evidence. We decided not to file an objection. I usually don't file objections if my clients don't direct or if I do not see that they have merit to file. I'm not going to file a meritless objection just to file an objection. It takes away your credibility with the Court. We were hoping for a 3553 downward departure. We had variance with the co-defendant . . . I did not file an objection because, after discussing it with my client, he agreed that it was not an argument that we would win. We did not have merit. And I decided - - . . . if I thought I had merit and had a shot of winning it, I probably would advise my client to let me file it. Because I want to do what's best for him . . . so we went on the best we could, what's the best plan B . . . I will not file a meritless objection if there's no law or evidence to support it in court. Okay? . . . If my client tells me to do that, that's a different situation. And I can't think of when that has happened. Most of the time my clients, they understand, they know the facts as well as I do. We've gone over them. We review the case law, we send the cases on dangerousness to our clients along with the facts so they can read them.

Dkt.# 406 at 62 – 64. Wolfe testified that he was sure he sent petitioner copies of cases on dangerousness, but he would have to review the file. "Either we sent them or we go over them. We do go over them though . . . anything that's in the plea agreement . . . any case law that's involved or any statute, is copied and given to the client . . . I give them lots of things to read, as you can see in the folder."

When asked whether he met with petitioner before the sentencing hearing, Wolfe testified that the hearing was scheduled for 10:30 am, although it did not begin till 10:55 am, and

> [t]here is a letter that you have, and I can provide it. It says, I will be at the court at 9:45, be there no later than 10. I was here at 9:30. I met with him - - I believe he probably got here around 10, we met for approximately 50 minutes. I do remember that we went over my standard preparation, and then Judge Bailey was still running late so we went over everything again . . . we met in a conference room that is outside – you know, we met probably 45 to 50 minutes . . . [p]rior to the sentencing.

Dkt.# 406 at 64 – 65. Wolfe testified, when asked again, that at no time during that meeting did Gooden ever tell him he wanted to file an appeal.

When questioned about his earlier testimony, as to how it was possible that he was able to have the May 23, 2012 letter to petitioner at his home address already prepared and ready to go out at 11:27 am, 32 minutes after the sentencing hearing began, Wolfe testified that the hearing was concluded at 11:15 am, and by the time he got back to his office, his secretary already had the letter ready and waiting for him to review and sign.

Wolfe testified that he did not agree that Mr. Gooden was ushered out of the courtroom quickly after the hearing; his recollection was that they had a conversation in the courtroom before the U.S. Marshals cuffed him and took him into custody. Again, he testified that petitioner did not request an appeal at that time.

Wolfe testified that at his office, all collect calls, not just calls from the jail, are accepted, "[e]ven collect calls from the jail which people are [sic] not my client, we accept." He testified that if a client called, his secretary would send him an email about it with their name and phone number, linked to the client file. He testified again that neither petitioner nor his mother ever called him after petitioner was sentenced. When asked if his statement was based on his review of his software program, Wolfe testified "[t]hat's a review of my memory . . . My recollection . . . [a]nd I went back and reviewed to see if there was any . . . message that would have been linked to the file under the name Roger Gooden, and there was none."

When asked how calls that came in when both he and his secretary were out of the office were handled, Wolfe testified that they had voice mail, and he also had calls forwarded to his cell phone, "[m]uch like when you called this week, it went straight to my cell phone so I picked it up and said hello, even though I might be somewhere else or in a meeting." When asked if that method worked with a collect call coming from the jail, Wolfe testified that he was not sure about leaving messages, but that his secretary could probably say. He clarified, testifying that on the office's answering service, a collect call from the TVRJ would say

> "you have a collect call from the [TVRJ] . . . If you will accept, please press, and then if the client will press, sometimes he can speak for a minute or so. But that's how the message is left. So I think there's a time frame on there because of the calling system from the regional jail. So if someone is not there [to answer the office phone] physically, they've [the caller] got maybe a minute or minute and a half to leave a message.

Dkt.# 406 at 69. When asked to verify that his testimony was that collect calls to his office from the TVRJ are accepted at his office, even when there was no one there to accept them, and that voice mails can be left, Wolfe testified that

> I do not know about what system they have currently today. Previously, when you asked that question, I remember that I would come in, I would listen to the messages. There would be . . . a message on there, you have a collect call from the . . . [TVRJ]. If you are willing to accept, please - - whatever. And then I've had in the past clients say, hey, this is so and so, can you come see me. I have had that happen, where that has been left on the answering machine. I don't think we accepted the call or picked up the call. Somehow the system allowed that to get through. So you know someone's trying to call. So I do have a memory of that happening, you know . . . Someone's trying to get ahold of me, so yeah . . . It will not accept the calls. It will - - it has recorded in the past when collect call attempts are made. So I know someone's attempted. I wish it wouldn't accept it and let them leave a message. What happens is it just records what's coming over with the call coming in. And I've had some clients that I guess know the system better, and they'll talk over it or are able to leave some kind of message saying, hey, come see me.

Dkt.# 406 at 70 – 71.

Wolfe testified again that he never received any letter from petitioner after the sentencing hearing, asking him to come see him or to file an appeal.

Wolfe testified again that he never received any call from petitioner's mother.

When questioned as to whether the May 28, 2012 letter he sent to petitioner at the TVRJ[10] made any mention of appealing, Wolfe said that the body of that letter did not. Wolfe agreed that at the time, the rule governing the number of days in which a criminal client had to file a notice of appeal had been recently changed from 10 to 14 days. Wolfe testified that the May 28, 2012 letter itself did not mention filing an appeal, but one of its attachments [the second copy of the May 23, 2012 letter] did.

On redirect examination, AUSA Parr questioned Wolfe about the May 28, 2012 letter including second copy of the May 23, 2012 letter which contained the language about filing an appeal, and Wolfe testified that his secretary attached the second copy of the May 23, 2012 letter to the May 28, 2012 letter.

## 5. **Dawn Bucher**[11]

Ms. Bucher testified that she had been employed as a legal assistant to Attorney Wolfe for five and a half years; that her responsibilities included answer the phones; taking messages; drafting letters; reviewing motions; proofreading; "just about everything."

She testified that she recalled Attorney Wolfe's representation of Roger Gooden and Gooden's being sentenced on May 23, 2012. She testified that she was not aware at the time she drafted the May 23, 2012 letter that was sent to Gooden at his home address that Gooden was remanded to jail immediately after sentencing, although she learned it subsequently.

---

[10] Dkt.# 401-3 at 1.

[11] Dawn Bucher's testimony can be found at Dkt.# 406 at 73 – 78.

She testified that after Gooden was sentenced, she never received any call, either collect or directly, from either Mr. Gooden or his mother. She testified that no one had ever directed her to have Attorney Wolfe contact petitioner at any time while he was at the TVRJ. She testified that she never received any communication from either petitioner or any of his family members, indicating a desire to file an appeal.

On cross exam, she testified that the phone system at Wolfe's office had a voice mail system to permit messages to be taken when no one was there to answer the phone. She testified that to her knowledge, an incoming call would never "just ring and ring and ring," it would always roll over to the voice mail system. She testified that calls coming from the TVRJ do not actually leave a voice mail, but that "the recording comes on and says you have a call from . . . [TVRJ], you know, press five if you want to accept. Well, of course, [because] it's a message, I can't press five so . . ." When asked if she had ever heard a call where a person attempting to make a collect call was able to leave some sort of short message, she testified that "[u]sually it will be like . . . you're receiving a collect call from . . . [TVRJ], from Inmate, and then they say their name. And then it goes back, right back to the recording again. That's - - I think that's the only thing I've ever gotten." When asked to clarify, she reiterated that the only "message" she ever heard left by a TVRJ inmate was the name of the jail inmate attempting to make the call.

When asked to describe how she handled incoming calls at the office that she answered directly, she testified that

> I just write it down and then I email it to Mr. Wolfe . . . Every call. Well, I can't say every call. Because there's some things that I can handle myself, you know, somebody just wanting to know a status of a case or something like that. I don't email him that.

Dkt.# 406 at 76 – 77. However, she testified that if a caller called, wanting to speak to Attorney Wolfe, she would take the caller's name and number, verify that the number was correct, and

then email it to Wolfe.  When asked if there were many times in the past five years where she had not made the email messages to Attorney Wolfe when someone called to leave a message, she testified that if she were on one line taking a message, and had to immediately take an intervening call, coming in on a different line, she might not email the first message immediately, but would, within the hour, email it to Attorney Wolfe, or hand it directly to him if he walked in the door.  When asked if, within the previous five years, while busy, she had ever missed sending Wolfe an email about a call, she testified "[o]h, I'm not going to say that. I mean, I probably have.  But I couldn't say for sure."

Regarding written correspondence that came into the office, Ms. Bucher testified that the office tries to scan everything into the computer so that everything is recorded in PDF form; once scanned, the letter is placed in the client's file, unless it required Attorney Wolfe's attention, in which case the original letter would be placed on his desk for him to draft a response, if necessary.

## III. <u>Analysis</u>

The sole issue to be addressed by this Court is whether the petitioner requested/instructed his attorney to file an appeal.

As a preliminary matter, it should be acknowledged that the petitioner waived his right to an appeal in his plea agreement. As to whether or not this waiver is valid, the Fourth Circuit has found that "a waiver-of-appeal-rights provision in a valid plea agreement is enforceable against the defendant so long as it is the result of a knowing and intelligent decision to forgo the right to appeal." <u>United States v. Attar</u>, 38 F.3d 727, 731 (4th Cir. 1994). The Fourth Circuit then found that whether a waiver is knowing and intelligent "depends upon the particular facts and

circumstances surrounding [its making], including the background, experience, and conduct of the accused." <u>Id</u>.

After upholding the general validity of a waiver-of-appeal-rights provision, the Fourth Circuit noted that even with a waiver-of-appeals-rights provision, a defendant may obtain appellate review of certain limited grounds. <u>Id</u>. at 732. For instance, the Court noted that a defendant "could not be said to have waived his right to appellate review of a sentence imposed in excess of the maximum penalty provided by statute or based on a constitutionally impermissible factor such as race." <u>Id</u>. Nor

did the Court believe that a defendant "can fairly be said to have waived his right to appeal his sentence on the ground that the proceedings following the entry of the guilty plea were conducted in violation of the Sixth Amendment right to counsel." <u>Id</u>.

In a subsequent case, the Fourth Circuit saw no reason to distinguish between waivers of direct appeal rights and waivers of collateral attack rights. <u>United States v. Lemaster</u>, 403 F.3d 216, 220. Therefore, like waiver-of-appeal-rights provision, the Court found that the waiver of the right to collaterally attack a sentence is valid as long as it is knowing and voluntary. <u>Id</u>.

Despite the fact that a defendant can waive his right to an appeal, the Fourth Circuit Court of Appeals has held that "a criminal defense attorney's failure to file a notice of appeal when requested by his client deprives the defendant of his Sixth Amendment right to the assistance of counsel, notwithstanding that the lost appeal may not have had a reasonable probability of success." <u>United States v. Peak</u>, 992 F.2d 39, 42 (4th Cir. 1993). In rendering this decision, the Court opined:

> Persons convicted in federal district courts have a right to a direct appeal. <u>Coppedge v. United States</u>, 369 U.S. 438, 82 S.Ct.917, 8 L.E.2d 21 (1962). In addition, the Sixth Amendment right to counsel extends to the direct appeal, <u>Douglas v. California</u>, 372 U.S. 353 (1963), and it obligates the attorney to file

the appeal and identify possible issues for the court even if, in the attorney's opinion, those issues are not meritorious. <u>Anders v. California</u>, 386 U.S. 738 (1967).

<u>Id</u>. at 41.

Further, in <u>Roe v. Flores-Ortega</u>, 528 U.S. 470 (2000), the Supreme Court recognized that "[i]f counsel has consulted with the defendant, the question of deficient performance is easily answered: Counsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal." <u>Flores-Ortega</u>, 528 U.S. at 478. Additionally, the Fourth Circuit maintains that counsel must file an appeal if asked, "even if doing so would be contrary to the plea agreement and harmful to the client's interests." <u>United States v. Poindexter</u>, 492 F.3d 263, 273 (4th Cir. 2007).

The standard for establishing ineffective assistance of counsel is the familiar standard articulated in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). The burden to prove ineffective assistance of counsel is on the petitioner, and the petitioner must prove that his legal assistance was ineffective under the two part analysis outlined in <u>Strickland</u>. First, the petitioner must show that his counsel's performance fell below an objective standard of reasonableness. <u>Id</u>. at 688. In reviewing claims of ineffective assistance of counsel, "judicial scrutiny of counsel's performance must be highly deferential," and the court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." <u>Id</u>. at 689-90.

Second, the petitioner must be prejudiced by counsel's performance. In order to demonstrate prejudice, "the defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id</u>. at

694. If the defendant shows no prejudice from the alleged ineffectiveness of counsel, courts need not address counsel's performance. Fields v. Att'y Gen. of Maryland, 956 F.2d 1290, 1297 (4th Cir.), cert. denied, 506 U.S. 885 (1992).

After an evidentiary hearing on whether counsel was instructed to file a Notice of Appeal, Poindexter requires the Court to determine whether the defendant unequivocally instructed his attorney to file a Notice of Appeal or, if his attorney was not so instructed, the court will determine if petitioner meets his burden of showing that: (1) his attorney had a duty to consult under Roe v. Flores-Ortega, 528 U.S. 470; (2) his attorney failed to fulfill his consultation obligations; and (3) he was prejudiced by his attorney's failure to fulfill these obligations. Poindexter, 492 F.3d at 273.

Based on these cases, the record and the facts of this case, the undersigned finds that petitioner has not satisfied Strickland's two-part test, proving that he requested his attorney to file an appeal, nor has he met his burden under Poindexter.

As a preliminary matter, in his §2255 petition and its later memorandum, petitioner only contended that he "expressly requested" that counsel file a notice of appeal once in person, directly after the sentencing hearing; that it was his understanding that counsel was going to file the appeal; and that thereafter, when he tried to contact counsel by letter and by phone, counsel did not respond or take his calls "either because [he] . . . is simply rejecting to talk to Me [sic] or there is a miscommunication."[12] Petitioner further asserted that he wrote "several letters" to counsel about the appeal, but did not keep copies; and that only after he had his family call the Fourth Circuit Court of Appeals to inquire about the status of the appeal, did he learn that no appeal had ever been filed.

---

[12] Dkt.# 357 at 8.

At the evidentiary hearing, however, petitioner testified he had repeatedly directly asked Attorney Wolfe about filing an appeal: first during a meeting when they discussed the PSR;[13] again, during a meeting at the courthouse on the morning of the sentencing hearing;[14] and then again, in a brief conversation in the courtroom immediately after the sentencing hearing.[15] Petitioner also contended that he then wrote two letters to Wolfe while at the TVRJ, requesting an appeal,[16] but did not keep copies of either,[17] and called twice, but could not get through.[18] He testified that he did not recall how it was he first learned that no appeal had been filed.[19]

A careful review of the record of the evidentiary hearing leads the undersigned to the conclusion that petitioner's recollection as to events that were either neutral to his cause, or supported his claims  by impugning counsel's performance, was sharp and acute, but his recollection as to anything that might undermine support for his claims was vague and uncertain. Moreover, petitioner's testimony was inconsistent with the record, and inconsistent that of his own witness on several points.  Attorney Wolfe's testimony, on the other hand, is corroborated by the evidence of record that shows a defense consistent with Wolfe's stated testimony: that petitioner never expressed any intention to appeal the three-level methamphetamine sentencing enhancement.

---

[13] Dkt.# 406 at 27 -28.

[14] Dkt.# 406 at 28 - 29.

[15] Dkt.# 406 at 30.

[16] Dkt.# 406 at 32 – 33, 35, 38 – 40, 43.

[17] Dkt.# 406 at 39.

[18] Dkt.# 406 at 31 – 32, 36.

[19] Dkt.# 406 at 38.

Petitioner's testimony that he requested an appeal when he met with counsel to go over the PSR, and that counsel advised him at that time "there were certain things that did or did not happen that we may have to file an appeal at a later date" and/or that "there was still time to file an appeal" lacks credibility. Even assuming that an appeal was discussed at that time, it is unlikely that any experienced federal criminal defense attorney would respond in such a way. Moreover, it is clear from counsel's testimony that the three-level enhancement had been anticipated very early, well in advance of sentencing. Wolfe testified that even prior to the drafting of the plea agreement, he had attempted to informally address the sentencing enhancement issue with probation; with AUSA Steve Warner; on "Monday" for an hour with petitioner; and again on "Tuesday" with petitioner for approximately another hour.[20] He testified "we were aware that the dangerousness was going to be put on us. We weren't certain what grounds probation would look to. Obviously, we had some facts and they had some facts. We were hoping maybe they would not push it. They did push it. We informally -- we tried to persuade them not to, we tried to persuade Mr. Warner to support us, we could not get that support."[21]

It is apparent from the entire record, including petitioner's admission under oath at his Rule 11 hearing, that he and counsel had repeatedly reviewed the evidence against him; the elements of the crime; and the maximum penalty he faced if he went to trial, before he decided to accept the plea. At his plea hearing, petitioner testified under oath that after concluding that the government had sufficient evidence to prove its case, it was his "own idea" and his "own decision" to take the plea.[22] Accordingly, petitioner's present testimony that Wolfe was advising

---

[20] Dkt.# 406 at 52.

[21] Dkt.# 406 at 61.

[22] Dkt.# 366 at 18 – 20.

him, after having already entered his plea, that he could now challenge the three-level USSG-mandated methamphetamine enhancement in a subsequent appeal is simply not credible.

Petitioner's testimony about what Wolfe allegedly told him when they met at the courthouse on the morning of the sentencing hearing is inconsistent with other facts in evidence: petitioner contends that he "briefly mentioned" to Wolfe the possibility of appealing if "things [went] . . . a certain direction at the sentencing hearing," but that in spite of that, Wolfe "never really touched down on it." This is an unlikely response from an experienced criminal defense attorney whose testimony at the evidentiary hearing on the issue was that everything that was included in the sentencing memorandum and the PSR had all been prepared well in advance; that he was always talking with his client about what would be happening "next month;" that letters to Gooden were sent at the end of April about what was needed for the sentencing memorandum, to ensure its readiness for the date it would be mailed; that, consistent with that, a copy of the sentencing memorandum was given to petitioner in advance; and that if, "at any point in time he wished to challenge the dangerousness, he could have done that or we could have done that."[23] Further, Wolfe's testimony was that that at that point in his representation, just prior to sentencing, he had already met with Gooden to discuss the facts and his appellate rights; had advised him again prior to the entry of the plea; petitioner was advised again by the Magistrate Judge at the plea hearing; he advised Gooden again himself, after the plea hearing; that Gooden was advised again in the sentencing hearing, and that he was advised again after the sentencing hearing.[24] Wolfe also testified that he made notes documenting petitioner's not wanting to appeal, after the entry of the plea, notes which he had copied to the AUSA for the evidentiary

---

[23] Dkt.# 406 at 53.

[24] Dkt.# 406 at 47.

hearing;[25] had thoroughly advised his client on the issues and the law;[26] had given his client copies of all applicable statutes and case law;[27] and had concluded, along with his client, that there were no meritorious grounds on which to file objections.[28]

Accordingly, at this point in petitioner's criminal prosecution, any objections would have been long-since filed. Had Gooden actually suddenly conveyed such a request to Wolfe immediately before the sentencing hearing, Wolfe would most likely have "touched down" on it, given that there were no grounds on which to challenge the USSG-mandated enhancement. Further, if petitioner had previously requested an appeal in the event that the enhancement was imposed, there would likely be some evidence in the record to his show his dissatisfaction with counsel for not abiding by his wishes on such an important point. To the contrary, there is no pre-sentencing hearing request to the Court for new counsel because his own was refusing to enter objections on his behalf, nor any complaint at his plea hearing about counsel's performance. Consistent with Attorney Wolfe's testimony, however, the record does reflect that the presentence investigation Report ("PSR"), enclosing the information about the enhancement,[29] was disclosed to the parties on March 30, 2012, almost eight weeks before the sentencing hearing.[30] It was revised April 2, 2012.[31] On May 14, 2012, eight days before the May 23, 2012 sentencing hearing, Wolfe filed his Sentencing Memorandum on petitioner's

---

[25] Dkt.# 406 at 48.

[26] Dkt.# 406 at 64.

[27] Dkt.# 406 at 49, 64.

[28] Dkt.# 406 at 61- 64.

[29] Dkt.# 279 at 15.

[30] Dkt.# 279 at 1.

[31] Dkt.# 279 at 1.

behalf, stating that "[w]e agree with the Probation Office's calculation of Mr. Gooden's sentencing guidelines in this case" and referencing the three-level methamphetamine enhancement.[32]

Petitioner sat through the sentencing hearing; while his testimony at the evidentiary hearing was that he didn't speak up when counsel failed to object, because he did not know if he could because he was unfamiliar with federal court procedure, the record of the sentencing hearing shows that he freely answered questions whenever asked.[33] When asked if he had received a copy of his PSR and gone over it with counsel, he promptly answered "Yes, Your Honor."[34] When counsel stated in open court that there were no objections to the PSR, petitioner did not protest;[35] when the court announced its tentative findings, including the three-level enhancement, he did not protest;[36] when the court asked if there were any objections to the tentative findings and counsel said that there were not, he did not protest.[37] Finally, after counsel's long argument on his behalf, in support of a downward departure, when given an opportunity to directly address the court, he declined to do so.[38]

Therefore, the fact pattern scenario petitioner now urges the court to adopt, that defense counsel made such a non-committal response to his grossly late request to object to the enhancement on the morning of sentencing, and to appeal if he did not receive it, is highly

---

[32] Dkt.# 244.

[33] Dkt.# 406 at 2, 3, and 10.

[34] Dkt.# 364 at 3.

[35] Dkt.# 364 at 3.

[36] Dkt.# 364 at 4.

[37] Dkt.# 364 at 5.

[38] Dkt.# 364 at 10.

unlikely when viewing the record as a whole. Moreover, it is inconsistent with the claim petitioner made in his §2255 petition, that he objected so much to the 3-level sentencing enhancement, that he would have addressed the enhancement himself if only he had he known counsel had no intention of doing so. As noted in the original R&R, the record reveals that each time petitioner was given the opportunity to dispute the findings that supported the enhancement, or the enhancement itself, at the plea hearing or at sentencing, he did not. Accordingly, this claim is not credible.

Petitioner testified that in a brief conversation with Wolfe immediately after the the sentencing hearing, before the Marshals whisked him away, he again requested an appeal but that counsel "just began gathering his papers and didn't even give me a second glance."[39] A review of the record indicates that the Court thoroughly advised petitioner of his appellate rights at the end of the hearing, but that if petitioner felt he had grounds, he could file an appeal *in forma pauperis* within fourteen days following the entry of the Judgment and Commitment Order. The Court advised that if petitioner wished to appeal, the Clerk of Court could enter a Notice of Appeal for him.[40] However, petitioner neither requested an appeal nor did he avail himself of the offer to have the Clerk file the Notice on his behalf. Petitioner's testimony is inconsistent with Wolfe's, who testified that that the Marshals did *not* whisk petitioner away immediately; that they briefly conversed in the courtroom; petitioner did not request an appeal; and he specifically recalled petitioner "exiting and looking back after we chatted. He did not get to self-report . . . I

---

[39] Dkt.# 406 at 30.

[40] Dkt.# 364 at 15.

was kind of upset with that. And I could see that he wasn't as upset as me, but he was surprised."[41]

Petitioner testified that after the sentencing hearing, while still incarcerated at the TVRJ for "7 – 10 days," he tried to call Wolfe's office twice, but the first time it rang endlessly without picking up or going to voice mail, and the second, someone picked up but refused to accept the charges for the collect call. No one asked petitioner, either on direct or cross exam, whether his calls were made on a weekday or a weekend, or whether they were made during normal business hours. Accordingly, the undersigned is left to assess petitioner's testimony as to these events, which is inconsistent with the very clear testimony from Wolfe and Bucher about how all collect calls, including collect calls from the TVRJ, are routinely handled at their office. Wolfe testified unequivocally that directly-answered collect calls from the jail, even calls from non-clients, are never refused;[42] Bucher testified that she never received any call, collect or otherwise, from Gooden.[43]

Petitioner also testified that he also wrote two letters to Wolfe from the TVRJ but never received any response. The undersigned finds it plausible that one letter entrusted to the U.S. Postal Service might go astray and not be timely received, but finds it unlikely that two from the same sender within the same week, sent to the same address, would; moreover, given the testimony from Bucher as to the routine procedures for handling incoming mail at the office,[44] petitioner's theory, that an experienced criminal defense attorney who neither party testified was hostile to his client, was simply ignoring him or refusing to respond, is unlikely.

---

[41] Dkt.# 406 at 49.

[42] Dkt.# 406 at 68.

[43] Dkt.# 406 at 74.

[44] Dkt.# 406 at 78.

Further, petitioner testified that while at the TVRJ, he asked his mother to call Attorney Wolfe's office to let Wolfe know he needed to speak to him about filing an appeal,[45] and that his mother told him later that she had tried but was never able to get through.[46] Petitioner's mother, on the other hand, testified that petitioner asked her to contact his attorney because it was important; that after she tried "7 – 10 times" to reach Wolfe on her cell phone while walking to and from work, she finally got through to someone, who she thought was a woman, and conveyed the message that petitioner needed to talk to Wolfe. She further testified that she was "pretty sure" she had advised her son afterwards that she had gotten through and left the message.[47] She testified that she and her son never discussed the issue again,[48] and she was unaware that the matter concerned was the filing of an appeal, until she was contacted by counsel, in advance of the evidentiary hearing.

Mrs. Oldacker's claim that she did get through to Wolfe's office, spoke to a woman and conveyed the message to her that petitioner needed to speak to Wolfe is not credible, given the very clear recollections of both Wolfe and Bucher to the contrary,[49] as well as their failure to locate anything within their computer and/or paper files from petitioner or anyone on his behalf, after sentencing.

---

[45] Dkt.# 406 at 37.

[46] Dkt.# 406 at 36 and 39.

[47] Dkt.# 406 at 17.

[48] "We didn't discuss that anymore." Dkt.# 406 at 17.

[49] Dkt.# 406 at 54 - 55, 69 – 71, and 74.

Gooden testified that he also wrote a letter to his mother from the TVRJ, asking her to contact Wolfe on his behalf;[50] his mother's testimony as to that point was that her son "might have."[51]  Neither produced copies of any letters.

Gooden also testified that he was "fairly sure" his mother wrote a letter to Wolfe's office on his behalf;[52] consistent with both Wolfe and Bucher's testimony that none was ever received, Mrs. Oldacker  testified that that she did not.[53]

Attorney Wolfe testified that neither petitioner nor any member of his family ever, at any time before or after the sentencing hearing, either directly, by phone, or by letter, requested that he file an appeal on petitioner's behalf.[54]  He further testified that petitioner was already well aware of the 3-level methamphetamine enhancement during a pre-plea-agreement phone conference he had with petitioner regarding it, during which Wolfe's secretary took notes, and petitioner did not ask to appeal.[55] Once the plea agreement had been finalized and a copy sent to petitioner for his review, Attorney Wolfe specifically recalled meeting to go over it with petitioner, paragraph by paragraph, including the appellate waiver paragraph, and petitioner did not ask to appeal.[56]  When asked if he ever documented in Gooden's decision not to seek an appeal in the record, Wolfe testified that "[u]sually a letter will go out after the hearing to the client.  It might be in the notes which I provided to Mr. Parr.  I believe it's mentioned in the - -

---

[50] Dkt.# 406 at 37.

[51] Dkt.# 406 at 14.

[52] Dkt.# 406 at 37.

[53] Dkt.# 406 at 16.

[54] Dkt.# 406 at 48, 51, 53, 54, 58,  65, 68, and 71.

[55] Dkt.# 406 at 51 – 52.

[56] Dkt.# 406 at 58.

surrounding the entry of the plea, there is an entry in my notes about that. Other than that, it's just conversation with my client."[57] Wolfe testified that petitioner "never asked me to appeal any issue at any time."[58]

Here, assuming the May 28, 2012 letter was sent on May 29, 2012, six days after petitioner's May 23rd sentencing, the day the judgment was entered, the earliest it could have arrived was the seventh day after sentencing, or May 30, 2012. May 29, 2012 was a Tuesday, so it is unlikely that the letter would have been delayed by an intervening weekend. Petitioner's fourteen-day window to file an appeal would have expired not later than June 11, 2012. If petitioner were at the TVRJ for the full ten days, rather than only the seven, that would have afforded plenty of time for the May 28, 2012 letter to arrive. Petitioner testified that he never received the May 28, 2012 letter with its attachments until sometime in July, 2012, when it was forwarded to him at a BOP facility; that he never received the May 23, 2012 letter Wolfe testified was included with it; and that prior to the evidentiary hearing, he had never seen the May 23, 2012 letter. However, given the silence of the record on these issues, there is no way to verify that petitioner did not receive the letters within the 14-day relevant time period, while still at the TVRJ, and so undersigned is left with a credibility analysis. Given that petitioner contends he received this letter sometime in July, 2012, petitioner still waited ten months to file his §2255 motion, until May 23, 2013, six days before its one-year statute of limitations ran.

The undersigned finds that petitioner's testimony lacks credibility and is inconsistent with the facts as stated in his §2255 petition. Nowhere there does he  mention he requested Wolfe to appeal at any time until after the sentencing hearing, or ever asking his mother to

---

[57] Dkt.# 406 at 48; see also id. at 51-52 and 61.

[58] Dkt.# 406 at 53.

contact Wolfe on his behalf. Moreover, his mother's testimony conflicts with his on several major points: she testified that after calling repeatedly, she did finally get through to the office and left a message, which she told petitioner about afterwards. Petitioner, on the other hand, testified that his mother told him that she was *never* able to get through to Wolfe. Petitioner further testified that he believed his mother wrote a letter on his behalf to Wolfe; petitioner's mother said she did not. It seems unlikely that petitioner's mother would be unaware of the reason for son's urgent request. While petitioner testified that he did tell her he needed to speak with his attorney regarding filing an appeal, his mother's testimony was that she had no idea the reason her son wanted to reach Wolfe was to file an appeal until Attorney Leary, counsel for petitioner at the evidentiary hearing, contacted her.[59] Further, since petitioner had been thoroughly advised of his appellate rights at the end of the sentencing hearing, and instructed that he could contact the Clerk of Court to get the Notice filed, if he could not reach his own attorney, why did he not merely call the Clerk's Office? Petitioner contends that he never received the May 28, 2012 letter with its attachments until "sometime in July, 2012," when he was at FCI McDowell. He testified that the letter was "backdated for . . . sometime in May."[60] He further testified that he had never seen the May 23, 2012 letter,[61] a second copy of which Wolfe testified was specifically included as an attachment to that letter, because it referenced the appellate period beginning on the date the judgment was entered.[62]

---

[59] Mrs. Oldaker was also apparently uncertain as to whether petitioner was actually free on bond before sentencing or not (cf. Dkt.# 406 at 11 and 12), and during the time period after he was sentenced and remained in the area at the TVRJ, she testified that she never visited him there. Id. at 18.

[60] Dkt.# 406 at 34.

[61] Dkt.# 406 at 33.

[62] Dkt.# 406 at 50-51 and 73.

Wolfe's testimony that it was his practice to have a letter advising his criminal clients' right to an appeal ready to mail after sentencing is reasonable and consistent with what an federal criminal defense attorney with 21 years of experience would do. Wolfe further testified that, mindful of the difficulty his office had had with petitioner "staying in touch with us" during his representation, he put a response time of ten days in his May 23rd letter, rather than the new fourteen-day response time, in order to prompt petitioner to act without delay. Despite this, Wolfe testified that his office never had any request for an appeal from petitioner or anyone else on his behalf at any time.

Petitioner's claim that he sent not one, but two letters to counsel from the TVRJ, within the appellate time frame, requesting an appeal, lacks credibility given that he kept no copies and neither letter ever arrived. Attorney Wolfe and his secretary testified unequivocally that based upon a review of their recollections, as well as the paper and electronic records of their office, they never received anything from petitioner by mail after sentencing.[63] Petitioner's testimony that his collect call to Wolfe's office was answered but that the recipient refused to accept the charges is not credible, based on the recollection and testimony of Wolfe that he was "keeping tabs" on the case until the 14-day period ran, and Wolfe and Bucher's testimony as to how collect calls at the office during office hours were always handled.[64] Likewise, petitioner's mother's claims regarding the calls made to Wolfe's office that rang and did not pick up are inconsistent with Wolfe and his secretary's testimony about how incoming calls roll to voice mail or are forwarded to Wolfe's cell phone. Mrs. Oldaker's contention that she finally reached Wolfe's office and told the woman who answered that petitioner needed to speak to his attorney

---

[63] Dkt.# 406 at 71, 74 - 75.

[64] Dkt.# 406 at 68 - 70, 76.

lacks credibility as well. Given Wolfe's testimony that he was so mindful of the petitioner's 14-day appellate period that he monitored the case and "kept tabs on it" till the 14-day period expired, it appears unlikely that two letters could be mailed to Wolfe's office and never arrive; one call could be made to leave an urgent message that was never conveyed; and a collect call from the TVRJ, where both Bucher and Wolfe specifically testified that (after the first letter was mailed on May 23, 2012) they knew petitioner was incarcerated,[65] would likewise be refused.

Based upon the totality of the circumstances and by a preponderance of that evidence, the Court finds that Mr. Gooden never requested that Attorney Wolfe appeal his sentence at any time. This conclusion is supported by Attorney Wolfe's contemporaneously-created notes, provided to counsel for petitioner at the evidentiary hearing, that in a phone conference prior to the plea agreement, the dangerousness enhancement was discussed and petitioner's decision not to appeal was documented;[66] Wolfe's testimony that when he spoke with petitioner after the sentencing hearing, petitioner never requested an appeal; the fact that Wolfe sent Gooden the same standard post-sentencing hearing letter that he sent to all his criminal clients, advising him of his appellate rights;[67] and Wolfe and Bucher's specific recollections and office records produced, documenting their post-sentencing interactions, or lack thereof, with petitioner. Moreover, the conclusion is based upon petitioner's allegations as to what Wolfe's responses were, each time he allegedly requested an appeal; petitioner's general vagueness and lack of recollection about any issue that would tend to undermine his claims, and his very clear

---

[65] Wolfe testified that he instructed his secretary to call and verify Gooden's location before sending the May 28, 2012 letter to the TVRJ. He testified that she called the TVRJ and told Wolfe "I just checked, he's [still] there." Dkt.# 406 at 51).

[66] Dkt.# 406 at 48, 51-52, 61.

[67] Dkt.# 406 at 48.

recollection as to any other incident in the record helpful to him, especially incidents which might tend to inculpate his attorney.

It is well established that "counsel has a constitutionally-imposed duty to consult with defendant about appeal when there is reason to think . . . that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." Flores-Ortega, 528 U.S. at 480. Here, however, there is no credible evidence in the record to show petitioner ever reasonably demonstrated an interest in or request for an appeal. Accordingly, the undersigned finds that petitioner has not met his burden under Strickland, Flores-Ortega, or Poindexter. He has not shown that counsel failed to perform in a professionally unreasonable manner by failing to follow his express instructions with respect to an appeal. Wolfe's office remained open and available for communications from petitioner, should petitioner have changed his mind about appealing, and despite petitioner's contentions to the contrary, it appears those communications did not come during the relevant time period. Finally, even if petitioner could prove counsel ineffective, petitioner cannot prove prejudice, because the methamphetamine enhancement issue he wanted raised on appeal was an enhancement mandated by the USSG; even had an appeal been filed, it would not have succeeded. Poindexter, 492 F.3d at 273.

Therefore, it is recommended that the petitioner's remaining Ground Three §2255 claim be denied.

## IV. Recommendation

Based upon a review of the record, the undersigned recommends that government's pending Motion to Dismiss §2255 Motion (Dkt.# 367) be **GRANTED** and that the petitioner's remaining §2255 motion Ground Three be **DENIED** and **DISMISSED with prejudice** from the docket.

**Within fourteen (14) days** after being served with a copy of this report and recommendation, **or by October 29, 2014**, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections shall also be submitted to the United States District Judge. **Failure to file timely objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation**. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is directed to transmit a copy of this Report and Recommendation to all counsel of record via electronic means.

DATED: October 15, 2014

/s/   James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE